(No. 12603.—Judgment affirmed.)
WILLIAM ALLOTT, Appellant, *vs.* THE WILMINGTON LIGHT AND POWER COMPANY, Appellee.

*Opinion filed June 18, 1919.*

1. WATERS—*owner of land bordering river has title to center of stream.* Grants of land bordering upon a river give title to the grantee to the center of the stream unless by the terms of the grant an intention is clearly shown to stop at the stream's edge; and this is true even though plats or descriptions attempting to describe the property state that it is of a certain width or length.

2. SAME—*fact that a stream was meandered by governmental surveyors tends to show it was a river channel.* Meander lines are used ordinarily only in surveying lands adjacent to a stream, whether navigable or not, and the fact that a stream was meandered by government surveyors tends to show that they considered it a river channel when the survey was made.

3. SAME—*owners of land bordering river have easement for discharge of water from tail-race.* The owners of land bordering upon a river have a right to have water flow into the stream from the tail-race of a mill on their property.

4. EJECTMENT—*plaintiff in ejectment must recover on strength of his title.* The plaintiff in an ejectment proceeding must recover on the strength of his own title and not on the weakness of the title of his adversary, and unless the plaintiff proves title in himself he cannot take any advantage of the failure of the defendant to prove title.

5. SAME—*proof must correspond with declaration.* The proof must correspond with the declaration in an action of ejectment, and where the declaration distinctly states that the plaintiff asks only for the recovery of property west of the west boundary of certain lots the plaintiff cannot recover any portion of the lots.

APPEAL from the Circuit Court of Will county; the Hon. ARTHUR W. DESELM, Judge, presiding.

ROBERT E. HALEY, (P. C. HALEY, of counsel,) for appellant.

O'DONNELL, DONOVAN & BRAY, and CORLETT & CLARE, for appellee.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was an action in ejectment brought by appellant, William Allott, in the circuit court of Will county, against appellee, the Wilmington Light and Power Company, to recover possession of a certain strip of land in said county. The declaration was the usual form, and appellee filed a plea of general issue and a special plea. The case has been twice tried in the circuit court. On the first trial, at the close of the case, the court directed a verdict for appellee. Appellant thereupon obtained a new trial under the statute, at which a jury was waived and the case submitted to a different circuit judge from the one who originally tried the case, and the court found the issues for the appellee and entered judgment accordingly. This appeal followed.

The land involved in this litigation lies along the Kankakee river, in the city of Wilmington. The river at this point runs slightly west of north, but for convenience we shall speak of it as if it ran north through said city. The premises in controversy were described in the declaration as follows: "The strip of land lying between block 2 of Alden's Island addition to Wilmington on the west, and the west line of water lots 1 and 2 of Cox & Bowen's Water Lot addition to the city of Wilmington, in said county." A

plat showing approximately the situation and surroundings of this strip of land is given herewith, not for the purpose of mapping accurately the disputed property, but to aid in obtaining a clear understanding of the matters in dispute:

Litigation involving certain rights connected with this locality has heretofore been before this court in *Allott* v. *American Strawboard Co.* 267 Ill. 272, and a plat of the

locality embracing a larger territory than the one here given will be found on page 276 of that opinion.

In 1838 the land in Water Lot addition to said city was owned by Cox & Bowen. They platted lots 1 and 2, along with nine other lots extending north from said lot 2 and ending with lot 11, the plat being made by the then county surveyor of said county, Addison Collins. A copy of the original plat was introduced in evidence, and the certificate of the surveyor thereto reads as follows: "I hereby certify that I have surveyed and actually laid out eleven water lots added to Wilmington for Thos. & Joseph Cox & A. W. Bowen adjoining their town platt & that this platt is the original and correct platt of said addition; that the lots are the dimensions in feet, respectively, as marked in figures on this platt; that the east side of said addition extends from the southwest corner of lot 1 in block 4 to the southwest corner of lot 2 in block 7, at each end of said line are stones sunk as monuments, and that a mill-race about 55 feet wide extends over said lots from the south to the north end of said addition." On the western border of all of these lots on the plat are the words "Kankakee river." The side lines of the various lots are parallel to each other and not far from perpendicular to the line marked as the Kankakee river, and the lengths of the respective lots apparently conform to the course of the river, the middle lots of the subdivision being longer and the lots toward each end being shorter.

The principal contention between counsel with reference to this litigation is as to where the western boundary line of lots 1 and 2 was located by this plat. It is argued by counsel for appellant that the boundary line was to be found by measuring the distance given on the plat as the length of each lot from the east boundary line of such lot as given on the plat, the east boundary line of the row of lots being marked at the north and south ends by stones placed in the ground, which can still be located. It is contended by coun-

sel for appellee, on the other hand, that the west boundary
lines of these lots were not fixed by means of the distance
stated on the plat as to the length of these lots but that the
line was fixed by the plat as the Kankakee river, and hence
the center thread of the Kankakee river was the western
line of said lots.

As will be seen from an examination of all the plats
submitted on the trial of this case as to the locality in ques-
tion, the Kankakee river a short distance south of this point
is divided into two branches by what has long been known
as Alden's island, that on the west having been known as
the west or main channel of the Kankakee river, while that
on the east, immediately adjoining said lots, has been known
as the east channel. As we understand the argument of
counsel for appellant, they contend that the evidence in this
record shows that there was never, in reality, any east chan-
nel of the river; that east of Alden's island was simply a
depression, through which in times of high water the water
flowed; that no water flowed continually through there.
Whether this be true or not, we do not consider it decisive
of the question as to where the west boundary line of lots 1
and 2 is located. That must be decided, largely, on the
basis of what was understood with reference to whether
there was a river directly west of the property as platted
in Water Lot addition, made in 1838. The evidence in the
record, in our judgment, tends strongly to show that from
the earliest time since this section was settled it was under-
stood that there were two channels to the Kankakee river,—
one on either side of said island,—and that all the plats
have so indicated. There is merit in the argument of coun-
sel for appellee that the question whether the west boundary
of these lots was the east branch of the Kankakee river was
settled by this court in *Allott* v. *American Strawboard Co.*
*supra,* where we said (p. 276): "In 1838 Thomas Cox,
Joseph Cox and Albert W. Bowen, while owning, as ten-
ants in common, Alden's island and all other lands riparian

288 – 35

to the east channel of the river, laid out into lots and platted a tract of land lying along the east side of the east channel of the river opposite the north part of Alden's island, calling the same 'Water lots added to Wilmington.' These lots were eleven in number, the most southerly being numbered 1, and the remaining lots, extending in a northerly direction from lot 1, being numbered consecutively to and including lot 11. Certain figures indicating the dimensions of each lot appeared on the plat, but the western boundary of each lot as shown on such plat is the east branch of the Kankakee river."

Counsel for appellant contend that the questions here involved were not raised or considered in the case quoted from, and that the statement in the opinion that the "western boundary of each lot as shown on such plat is the east branch of the Kankakee river" was unnecessary to the decision of the case. With this we cannot agree. It is clear from the last paragraph of the opinion, beginning at the bottom of page 300, that the question whether these lots were riparian to the river was necessary for the decision of some of the questions involved therein. The court stated in that paragraph: "As against water lot owners appellees have no right to interfere with the maintenance of dam No. 3 nor to obstruct the flow of water diverted by that dam into the east channel, and water lot owners have the right to peaceably remove obstructions placed in the east channel by appellees. (*Schmidt* v. *Brown,* 226 Ill. 590.) Appellees contend, however, that the water wheels of the American Strawboard Company are not located on any of the water lots, and that company, therefore, cannot justify its action in removing the obstructions on the ground that it was exercising its rights as a water lot owner. The American Strawboard Company is the owner of water lots 3, 4, 5, 6, 7, 10 and 11 and a part of water lot 9, and as such owner has a clear right to the unobstructed flow of water into and through the east channel. Whether it

is wrongfully using water from the mill-race is a question which does not concern appellees but can only be raised by another water lot owner." Manifestly, if these water lots ended on the western boundary at a distance measured on said plat and not at the Kankakee river, what is here said as to the rights of the water lot owners would not have been correctly stated. The same attorneys appeared for appellant, Allott, in the former litigation between appellant and others and the American Strawboard Company, decided in the opinion just referred to, and the briefs of Allott in that case and his petition for rehearing clearly raised the question that certain of the water lots in Cox & Bowen's Water Lot addition to Wilmington were not riparian to the east channel of the Kankakee river. In the petition for rehearing his counsel urged that the opinion was wrong because of this fact. There can be no question that a vital part of the decision in that case depended upon whether the owners of these water lots had any rights in the water flowing through the east channel at this point, and that, in its turn, depended on whether their lots extended to the east channel and were bordered thereby. If the western boundary of said lots was the east channel of the river, then the western boundary of said lots, under the settled authorities in this and other jurisdictions, was the center thread of the east channel. We see no reason to depart from our holding in that case as to the western boundary of the lots being the east channel of the Kankakee river. That it has always been the understanding that the east channel was really a river is corroborated by the reasoning in *People* v. *Kankakee River Improvement Co.* 103 Ill. 491, where this court said (p. 511) : "We do not understand that this provision would apply. It does not respect rivers, and we do not consider that a river becomes a canal from having its navigation improved by artificial means." A reading of the entire opinion in that case shows, without question, that the court was discussing the artificial channel that was constructed in the

so-called east channel of the Kankakee river from Baltimore to Bridge street north along the eastern boundary of block 2 on Alden's island, marked on the plat herein "Canal." Counsel for appellant, however, have argued so strenuously with reference to the western boundary of the water lots that we have decided to consider that question at some length as if it had not been considered and decided in the former decisions of this court.

Cox & Bowen's Water Lot addition to Wilmington (which we will so term for convenience regardless of its technical name, as to which the briefs differ,) was the first platted land immediately adjoining the property in dispute. Later the owners of the island platted the Island addition to Wilmington, including block 2 in said addition, shown in a general way on the plat accompanying this opinion. The witnesses who testified as to the location of the early buildings on lots 1 and 2 and the surrounding property did not agree fully in all particulars as to the time when such buildings were erected or the way in which the business was operated. This is not remarkable, as memory, everyone knows, is faulty, and we have little doubt that the witnesses were stating, as best they remembered, the exact situation on all these matters. A flour mill was evidently the first building constructed on lot 1 in said Water Lot addition, built, apparently, some time before 1860. This mill seems to have been destroyed by a flood in the east channel, and later a new grist mill, called the White Cloud mill, was erected practically on the same foundation as the old mill between 1870 and 1880. At about the same time appellee or its predecessor erected an electric light plant on water lot 2. A dam had theretofore been constructed across the east channel of the Kankakee river immediately south of the south line of water lot 1, extending west, being at the place designated on the plat as Baltimore street, which on Alden's island is called Bridge street, and serving both as a dam and a highway. Some years before the beginning

of this litigation appellee purchased a part, if not all, of
lot 1, upon which the White Cloud grist mill was located,
and prior to 1907 started to construct a new electric light
plant on the foundations of the old White Cloud mill.
These old grist mills on lot 1 were operated by water power,
receiving water from the east branch of the Kankakee river
through an opening under Baltimore (or Bridge) street and
discharging it out of the west side of the mill. In 1861
the Kankakee Company, for the purpose of improving for
navigation the east branch of the Kankakee river, deepened
that portion of the east channel north of Baltimore street
(marked as "Canal" in the plat) and adjoining block 2 on
Alden's island, and this part of the channel was again deep-
ened in 1870. The dirt and rock then excavated were
mostly thrown on the east side of the deepened portion,
but apparently some of it was thrown on the east side of
block 2 of the Island addition, which lies just west of the
deepened portion. At the time this channel was deepened
the testimony tends to show that the east channel was wider
just north of Baltimore street than it was farther north,
and apparently an expansion was made in the deepened
portion immediately north of Baltimore street, which was
known as the "basin" and was used for the turning of
boats, as navigation apparently did not extend south of
Baltimore street until after the lock was constructed there,
about 1870. On the east side of this portion of the east
channel or canal, some time about the early seventies, there
was a stone wall constructed, as some of the witnesses tes-
tified, to prevent the water discharged from the mill located
on water lot 1 from driving against the boats in the basin,
and after that the water coming out of the mill on water
lot 1 ran west to the wall and then north along the wall,
ultimately emptying into the east channel of the Kankakee
river. There is testimony, however, on behalf of appellant
which tends to show that some of the water, at least, used
in the grist mills on water lot 1 ran northwesterly from the

mills across lot 1 and did not reach the east branch of the
Kankakee river until it had run about as far north as water
lot 8. The deepened portion of the east channel was there-
after called the "canal," and is so noted on some of the
plats introduced in evidence and on the plat accompanying
this opinion. There is also testimony from a former owner
of water lot 2, who operated a grist mill thereon, that the
water discharged from his mill ran south from lot 2 to a
tail-race leading from the grist mill on water lot 1 and then
ran west in the tail-race to the river. There is testimony
in the record on behalf of appellee which tends strongly to
show that during all the time the grist mills were being
operated on water lot 1 the water used by said mills ran
directly into the east channel of the Kankakee river, both
before and after the deepening of said channel. The evi-
dence before us also tends to show that many of the deeds
transferring the property, or portions of it as located on
the Water Lot addition to Wilmington, intended to convey
said property because it was being used for water power
purposes and along with the property intended to convey
such water power rights.

There can be no question that grants of land bordering
upon a river give exclusive right and title to the grantee
to the center of the stream unless by the terms of the grant
an intention is clearly shown to stop at the stream's edge.
This rule has been laid down by this court in *Houck* v.
*Yates*, 82 Ill. 179, *Davenport and Rock Island Bridge Rail-
way and Terminal Co.* v. *Johnson*, 188 id. 472, *Village of
Brooklyn* v. *Smith*, 104 id. 429, *Chicago, Rock Island and
Pacific Railway Co.* v. *People*, 222 id. 427, and *Peoria Gas
and Electric Co.* v. *Dunbar*, 234 id. 502. This has been
held to be true even though plats or descriptions attempting
to describe the property stated that it was a certain width
or length. In *Chicago, Rock Island and Pacific Railway
Co.* v. *People, supra,* the court said (p. 434) : "It is true
the certificate states that Water street is 110 feet in width,

but the decisions in this State hold that when a street is bounded on one side by a river, even though the plat gives its width in actual figures, it extends to the center of the river." In *Peoria Gas and Electric Co.* v. *Dunbar, supra,* the plat in evidence showed that the length of a certain lot was 110 feet, and it was argued that if the ownership extended to the center thread of the stream it would give a lot 240 feet in length, which would be most unreasonable. In disposing of that contention the court said (p. 503) : "It is also well settled by numerous decisions of this court that where natural monuments or boundaries are mentioned in conveyances such monuments or boundaries control over distances. In this case lot 4 in block 51 is conveyed by a plat showing that this lot extends to the Illinois river. The distance, 110 feet, mentioned on the plat must give way to the natural monuments. This would be true even if the conditions when the plat was made were the same as they are now. The reasonable inference is that in 1836, when the plat was made, the distance from Water street to the river was approximately 110 feet, and that the natural accumulations have extended the lot to its present length."

Counsel for appellant concede that this is the law generally, but insist that the law cannot be applied to the facts in this case for the reason that the western lines of lots 1 and 2 do not extend to the east bank of the east branch; that the evidence introduced on the trial, both written and oral, tends to show that the intention and purpose of the proprietors of the Water Lot addition was to limit the size of the lots to the dimensions noted on Cox & Bowen's plat of the Water Lot addition. Said plat, which was introduced in evidence, shows that the length of the eleven water lots varied, according to the turnings or sinuosities of the east branch of the Kankakee river. There is nothing in the record to disclose that there was any intention to limit the length of these lots except as they were limited by the course of the river. Then, too, the east line was marked by

monuments at its north and south ends, and no such fixed marks or monuments were located at the western boundaries of any of these lots. In view of the situation and surroundings we think it is clear that if the original owners had intended to limit the western boundaries to the distances marked upon the plat they would have located fixed monuments there. There can be no question that at that time the eastern channel of the Kankakee river was immediately adjacent to the west boundary lines of these lots as marked on said plat. The certificate described these lots as water lots, and all the public plats introduced in this record, as well as all the conveyances which have reference to this property, indicate an intent on the part of the proprietors to make use of them as water lots and to claim and exercise for themselves the water rights connected with the water lots. In our judgment the great weight of the evidence in this record shows clearly that the western boundary of these lots was intended to be the east branch of the Kankakee river, and therefore these lots extended to the center thread of said east branch. Nothing is said by this court in *Kinsella* v. *Stephenson,* 265 Ill. 369, cited and relied on by counsel for appellant, in view of the facts in that case, which in any way conflicts with this conclusion.

The evidence in this record shows that the east channel was meandered when it was originally surveyed by the government, and meander lines are used usually only in surveying lands adjacent to a stream, whether navigable or not. (4 R. C. L. 97; 9 Corpus Juris, 189.) The fact that this channel was meandered tends strongly to show that the government surveyors considered that it was a river channel at the time the survey was made. There was also introduced in evidence a memorandum from a book in the recorder's office in Will county, apparently made at the time of one of these original surveys, which gives the width of the Kankakee river and the width of the "smaller channel

which lies on the east, as two chains and fifty links, September 11, 1821." While it is true there is evidence in the record tending to show that large trees were growing west of the west boundary lines of lots 1 and 2 on the east bank of the channel, if the measurements on Cox & Bowen's Water Lot addition be considered as giving the correct lengths, still, in our judgment the evidence is conclusive that this east channel was meandered as a flowing stream by the government originally, and this has always been considered as the east branch of the Kankakee river by all people who have platted this locality, and it has been so understood in practically all deeds conveying any property adjacent to or bordering on said east channel.

The evidence tends to show, as argued by counsel for the appellant, that the plant of the appellee company as now constructed on water lot 1 extends west of the western boundary of said lot according to the distance marked on the original plat as to the length of lot 1. It is also true, as argued by counsel for appellant, that the record does not show from the government down a complete chain of title in appellee to the land in dispute. But it has been repeatedly held by this court that the plaintiff in an ejectment proceeding must recover on the strength of his own title and not on the weakness of his adversary's title. (*Hammond* v. *Shepard,* 186 Ill. 235; *Phelps* v. *Nazworthy,* 226 id. 254; *Terhune* v. *Porter,* 212 id. 595.) In the case last cited the court said, at the bottom of page 595, after citing authorities: "Unless the plaintiff proved title in herself the defendants could not be disturbed in the possession of the land, whether they had any title or not." Therefore in this proceeding, unless appellant proved title to the disputed strip in himself he could not take any advantage of the failure of appellee to prove valid title in itself. Obviously, under the facts and authorities already stated and cited, when the original owners of the disputed strip platted, in 1838, the Water Lot addition to Wilmington, in-

cluding lots 1 and 2, the western boundary of said lots extended to the center thread of the east branch of the Kankakee river, and therefore, when appellant attempted to obtain title in 1908 from Edward Alden to this strip between the center·thread and west boundary lines of lots 1 and 2, he received no title to said strip as Alden had no·title to convey; and this is conceded to be true, as we understand the arguments of counsel for appellant, if in making the original plat, in 1838, Cox & Bowen intended that the lots should extend to the east branch of the Kankakee river. Appellant is not entitled to recover any part of water lots 1 and 2 under this declaration, for the declaration distinctly states that he only asks to recover property west of the west lines of water lots 1 and 2. The proof must correspond to the declaration. Hurd's Stat. 1917, secs. 10, 22, pp. 1235, 1236; 5 Ency. of Evidence, 28, and cases cited in note 85; *Schoonmaker* v. *Doolittle,* 118 Ill. 605.

It is argued most earnestly by counsel for appellee that it is properly entitled to judgment in this case as to the disputed strip east of the center thread of the east channel because the proof shows that it has had hostile and adverse possession of the strip for more than twenty years before the commencement of this litigation. In view of the conclusion that we have reached as to the failure of appellant to prove any right to the property in dispute between the center thread of the east branch and the west boundary lines of lots 1 and 2, it is not necessary for us to discuss or decide the question of title by adverse possession. Neither is it necessary for us to decide the questions raised by appellant on the law of adverse possession, as ·stated by the propositions of law held or refused by the trial court.

Counsel for appellant argue that the judgment of the court in effect gave title to appellee to property west of the east channel of the Kankakee river. We do not so understand the record. In the special plea filed by appellee it disclaimed any right to possession of any land lying west

of the east branch of the Kankakee river as it existed at the commencement of this suit, except an easement to discharge water into that branch of the river. There can be no question that the owners of water lots 1 and 2, if their western boundary extended to the center-thread of the east channel of the river, would have a right to have water flow from the tail-race on their property into the east branch and thereafter into the main channel of the river at the north end of Alden's island. Under the judgment rendered by the trial court appellee would have no rights additional to those claimed by it in its special plea.

The judgment of the circuit court will be affirmed.

*Judgment affirmed.*